## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**PATRICK RABOCZKAY,**

        Plaintiff,                       **Case No. 19-cv-**
                                                  **HON.**

v.

**CITY OF TAYLOR,**
**HERMAN "BUTCH" RAMIK**, in his individual and official capacities as an elected member of the Taylor City Council, and
**RICK SOLLARS,** in his individual and official capacities as the elected Mayor of the City of Taylor**,**

        Defendants.
_____/
ANDREW A. PATERSON (P18690)
Attorney for Plaintiff
2893 E. Eisenhower Pkwy
Ann Arbor, MI 48108
(248) 568-9712
aap43@outlook.com
_____/

> **There is no other cause of action between the same or similar parties arising out the same transaction or occurrence.**

## COMPLAINT AND JURY DEMAND

NOW COMES PLAINTIFF, PATRICK RABOCZKAY ("**Plaintiff" or**

"**Plaintiff Raboczkay**"), by and through his attorney, ANDREW A. PATERSON,

and for his Complaint and Jury Demand ("**Complaint**"), states the following:

## I.      NATURE OF PLAINTIFF'S CLAIMS

1.  Plaintiff's claims are brought pursuant to 42 U.S.C. § 1983; 28 U.S.C. §§
1331, 1337, 1343, and 1367; and the Declaratory Judgment Act, 28 U.S.C. §
2201, *et. seq.*

## II.      JURISDICTION AND VENUE

2.   This Court has jurisdiction over Plaintiff's claims pursuant to 42 U.S.C. §
1983; 28 U.S.C. §§ 1331, 1337, 1343, and 1367.

3.   This Court has jurisdiction to render and issue a declaratory judgment
pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, *et. seq.*

4.   Venue is proper in the Eastern District of Michigan under 28 U.S.C. § 1391
because Plaintiff is a resident of the Eastern District of Michigan, and the
actions giving rise to this Complaint all occurred within the Eastern District
of Michigan.

## III.      PARTIES

5.  Plaintiff, Patrick Raboczkay ("**Plaintiff**" or "**Plaintiff Raboczkay**"), is a
registered and qualified elector, and homeowner in the City of Taylor,
County of Wayne, State of Michigan.  Additionally, Plaintiff is a retired
Taylor police officer that served the Defendant City of Taylor for 21 years.

6.  Defendant, City of Taylor ("**Defendant City**"), is a home rule city located in
the County of Wayne.

7. Defendant, Herman "Butch" Ramik ("**Defendant Ramik**"), is a duly elected member of the Taylor City Council.

8. Defendant, Rick Sollars ("**Defendant Sollars**"), is the duly elected Mayor of the Defendant City of Taylor.

### IV.   CAUSES OF ACTION

### COUNT I
**First-Amendment Retaliation Claim – Defendants Ramik and Sollars Retaliated Against Plaintiff For Exercising His First-Amendment Rights By Causing Plaintiff To Be Criminally Investigated By The Michigan Attorney General.**

13. Plaintiff incorporates, repeats, and realleges the foregoing allegations as though they were fully set forth and stated herein.

14. This claim is brought against the Defendants Ramik and Sollars, in both their individual and official capacities, pursuant to 42 U.S.C. § 1983.

15. From October 1997 through October 2017, Plaintiff served honorably as a police officer for the Defendant City.

16. Throughout Plaintiff's 20-year tenure as a police officer for the Defendant City, Plaintiff never received any disciplinary reprimands or write ups by his superiors.

17. On September 29, 2016, Plaintiff was certified by the Michigan Department of State to perform salvage vehicle inspections.

18. While an officer and employee of the Defendant City's police department, in October 2016, Plaintiff was permitted to perform salvage vehicle inspections on behalf of the Defendant City while off duty.

19. Then former police chief, Mary Sclabassi, authorized Plaintiff and now recently retired Taylor police officer Cpl. Michowski to perform salvage vehicle inspections while off duty, as well as on duty.  (**See Mary Sclabassi's affidavit attached as Exhibit A**).

20. The arrangement authorized by former police chief Mary Sclabassi initially allowed Plaintiff and Cpl. Michowski to receive 80% of the fees collected, with the remaining 20% being given to the Defendant City's police department.  This arrangement was later amended allowing Plaintiff and Cpl. Michowski to receive 100% of the fees collected from the salvage vehicle inspections. (**See Mary Sclabassi's affidavit attached as Exhibit A**).

21. Plaintiff and Cpl. Michowski were given authorization to use the Taylor Police Department's LEIN system while on and off duty for the sole purpose of checking VIN number of the vehicles they were inspecting while conducting the salvage vehicle inspections. (**See Mary Sclabassi's affidavit attached as Exhibit A**).

22. That as a sponsor of Plaintiff and Cpl. Michowski, pursuant to Michigan law, the Taylor Police Department was authorized to compensate an off-duty and limited enforcement police officers for salvage vehicle inspections. (**See Mary Sclabassi's affidavit attached as Exhibit A**).

23. On October 20, 2017, after 21 years of service, Plaintiff officially retired as police officer for the Defendant City's police department.

24. Upon retiring, Plaintiff immediately entered into a personal service contact with the Defendant City to serve as the CMV Weigh Master/Motor Carrier Officer and to continue to perform the salvage vehicle inspections on behalf of the Defendant City. (**See Defendant Sollars' Letter attached as Exhibit B**).

25. In a letter signed by Defendant Sollars, effective October 20, 2017, the Defendant City and its Police Department sponsored Plaintiff as a salvage inspector for the State of Michigan. (**See Defendant Sollars' Letter attached as Exhibit B**).

26. According to Defendant Sollars' letter, as a sponsor of the Plaintiff, the Defendant City agreed to compensate the Plaintiff with 100% of the fees collected for performing the salvage vehicle inspections while off duty as secondary employment.  Any inspections that occurred while on duty would result in 100% of the fees collected being deposited in the

Defendant City's salvage vehicle account. (**See Defendant Sollars' Letter attached as Exhibit B**).

27. In March 2018, Plaintiff and Cpl. Michowski were approached by Chief John Blair and were asked to provide their opinions about the reputation and performance of J and M Towing and whether the Defendant City should choose J and M Towing as the exclusive tower for the Defendant City.

28. Plaintiff advised Chief John Blair that the Defendant City should not use J and M Towing because they were untrustworthy, had questionable drivers with criminal records and Plaintiff and Cpl. Michowski had to write J and M Towing numerous tickets for violating state law and local ordinances in the past.

29. Chief John Blair shared Plaintiff's thoughts and feelings about J and M Towing with the Defendants Ramik and Sollars, along with the other members of the Taylor City Council, during a March 19, 2018 closed session.

30. After the March 19, 2018 closed session at which Chief John Blair disclosed Plaintiff's opinion regarding J and M Towing to Defendants Ramik and Sollars, Defendant Ramik began sending false and defamatory letters to the Michigan Secretary of State requesting the state

to conduct a criminal investigation into the Defendant City's salvage vehicle inspection program.

31. Additionally, Defendant Ramik demanded that the Defendant Sollars also cause an internal investigation to be conducted into the salvage vehicle inspection program by the Defendant City's police department.

32. Upon information and belief, Defendant Ramik has a close relationship with the owner of J and M Towing.  In fact, Defendant Ramik has been pressuring city officials to give J and M Towing an exclusive towing contract to handle all towing for the Defendant City.

33. On March 31, 2018, Defendant Ramik met with Defendant Sollars and falsely advises Defendant Sollars that Plaintiff and Cpl. Michowski were going to be charged with felonies.

34. Upon learning of what was said by Defendant Ramik at this meeting, Plaintiff immediately contacted Defendant Sollars, who advised Plaintiff that Defendant Sollars and Defendant Ramik had met at the Tim Hortons on Allen Rd and during this meeting, Defendant Ramik informed Defendant Sollars that Plaintiff and Cpl. Michowski were going to prison.

35. On April 3, 2018, Plaintiff received a letter at his home residence from the Michigan Secretary of State informing Plaintiff that the salvage

vehicle inspection program was under investigation and that an audit would be conducted based upon a complaint the Secretary of State had received from the Defendant Ramik.

36. On April 5, 2018, Plaintiff received a letter from Deputy Police Chief Richard Hopper informing Plaintiff that Plaintiff's position had been suspended pending the outcome of the investigation. Since April 5, 2018, Plaintiff has been suspended without pay.  (**See Deputy Chief Hopper's April 5, 2018 Letter attached as Exhibit C**).

37. On April 12, 2018, the Detroit News publishes an article quoting Defendant Ramik falsely accusing Plaintiff of fraud, theft and embezzlement. (**See April 12, 2018 Detroit News article attached as Exhibit D**).

38. Notably, the April 12, 2018 Detroit News' article also quotes Defendant Sollars, who falsely states that "questionable actions may have occurred." (**See April 12, 2018 Detroit News article attached as Exhibit D**).

39. Then on April 16, 2018, Defendant Ramik went on Fox 2 News and again falsely accused Plaintiff of fraud, theft, and embezzlement. (**See April 16, 2018 Fox 2 News story attached as Exhibit E**).

40. Defendant Ramik's retaliatory antics continued with defamatory statements made in an April 21, 2018 article published in the Sunday Times newspaper, in which Defendant Ramik again falsely accused Plaintiff of fraud, theft and embezzlement.

41. The Michigan Attorney General's office conducted the criminal investigation on behalf of the Michigan Secretary of State.

42. Plaintiff voluntarily interviewed with investigators from the Michigan Attorney General's office, which lasted for nearly 4 hours.

43. In August 2018, Plaintiff and Cpl. Michowski were cleared of any criminal wrongdoing with respect to the salvage vehicle inspection program for the Defendant City.

44. Defendants Ramik and Sollars retaliated against Plaintiff by causing Plaintiff to be criminally investigated by the Michigan Secretary of State and Attorney General because Plaintiff spoke out against J and M Towing, which is the towing company Defendants Ramik and Sollars are attempting to award an exclusive towing contract to on behalf of the Defendant City.

45. Plaintiff was subject to the criminal investigation only after the Chief of Police shared Plaintiff's opinion about J and M Towing with the Defendants Ramik and Sollars and the other members of the Taylor City

Council at the March 19, 2018 closed session of the Taylor City

Council.

46. Defendants Ramik and Sollars retaliated against Plaintiff because J and

M Towing is the preferred choice of Defendants Ramik and Sollars to

receive an exclusive towing contract with the Defendant City.

47. Plaintiff's negative comments about J and M Towing was detrimental to

J and M Towing receiving the support of the other members of the

Taylor City Council.

48. Consequently, Defendants Ramik and Sollars vowed revenge against the

Plaintiff by retaliating against him by causing him to be criminally

investigated by the Michigan Attorney General.

49. Upon information and belief, Defendants Ramik and Sollars are

receiving financial kick backs from J and M Towing.

50. Defendants unlawful and unconstitutional actions have caused Plaintiff

great harm to his stellar professional reputation and financial loss.

51. As a result of Defendants' unconstitutional and unlawful conduct,

Plaintiff seeks damages in excess of $2.5 million.

## COUNT II
**First-Amendment Retaliation Claim – Defendants Ramik and Sollars Retaliated Against Plaintiff For Exercising His First-Amendment Rights By Causing Plaintiff's Employment To Be Terminated.**

52. Plaintiff incorporates, repeats, and realleges the foregoing allegations as though they were fully set forth and stated herein.

53. This claim is brought against the Defendants Ramik and Sollars, in both their individual and official capacities, pursuant to 42 U.S.C. § 1983.

54. As noted, in March 2018, Plaintiff and Cpl. Michowski were approached by Chief John Blair and were asked to provide their opinions about the reputation and performance of J and M Towing and whether the Defendant City should choose J and M Towing as the exclusive tower for the Defendant City.

55. Plaintiff advised Chief John Blair that the Defendant City should not use J and M Towing because they were untrustworthy, had questionable drivers with criminal records and Plaintiff and Cpl. Michowski had to write J and M Towing numerous tickets for violating state law and local ordinances in the past.

56. Chief John Blair shared Plaintiff's thoughts and feelings about J and M Towing with the Defendants Ramik and Sollars, along with the other

members of the Taylor City Council, during a March 19, 2018 closed session.

57. After the March 19, 2018 closed session at which Chief John Blair disclosed Plaintiff's opinion regarding J and M Towing to Defendants Ramick and Sollars, Defendant Ramick began sending false and defamatory letters to the Michigan Secretary of State requesting the state to conduct a criminal investigation into the Defendant City's salvage vehicle inspection program.

58. Additionally, Defendant Ramik demanded that the Defendant Sollars also cause an internal investigation to be conducted into the salvage vehicle inspection program by the Defendant City's police department.

59. Upon information and belief, Defendant Ramik has a close relationship with the owner of J and M Towing. In fact, Defendant Ramick has been pressuring city officials to give J and M Towing an exclusive towing contract to handle all towing for the Defendant City.

60. On March 31, 2018, Defendant Ramik met with Defendant Sollars and falsely advises Defendant Sollars that Plaintiff and Cpl. Michowski were going to be charged with felonies.

61. Upon learning of what was said by Defendant Ramik at this meeting, Plaintiff immediately contacted Defendant Sollars, who advised Plaintiff

that Defendant Sollars and Defendant Ramik had met at the Tim Hortons on Allen Rd and during this meeting, Defendant Ramik informed Defendant Sollars that Plaintiff and Cpl. Michowski were going to prison.

62. On April 3, 2018, Plaintiff received a letter at his home residence from the Michigan Secretary of State informing Plaintiff that the salvage vehicle inspection program was under investigation and that an audit would be conducted based upon a complaint the Secretary of State had received from the Defendant Ramik.

63. On April 5, 2018, Plaintiff received a letter from Deputy Police Chief Richard Hopper informing Plaintiff that Plaintiff's position had been suspended pending the outcome of the investigation. Since April 5, 2018, Plaintiff has been suspended without pay.  (**See Deputy Chief Hopper's April 5, 2018 Letter attached as Exhibit C**).

64. On April 12, 2018, the Detroit News publishes an article quoting Defendant Ramik falsely accusing Plaintiff of fraud, theft and embezzlement. (**See April 12, 2018 Detroit News article attached as Exhibit D**).

65. Notably, the April 12, 2018 Detroit News' article also quotes Defendant Sollars, who falsely states that "questionable actions may have

occurred." (**See April 12, 2018 Detroit News article attached as Exhibit D**).

66. Then on April 16, 2018, Defendant Ramik went on Fox 2 News and again falsely accused Plaintiff of fraud, theft, and embezzlement. (**See April 16, 2018 Fox 2 News story attached as Exhibit E**).

67. Defendant Ramik's retaliatory antics continued with defamatory statements made in an April 21, 2018 article published in the Sunday Times newspaper, in which Defendant Ramik again falsely accused Plaintiff of fraud, theft and embezzlement.

68. The Michigan Attorney General's office conducted the criminal investigation on behalf of the Michigan Secretary of State.

69. Plaintiff voluntarily interviewed with investigators from the Michigan Attorney General's office, which lasted for nearly 4 hours.

70. In August 2018, Plaintiff and Cpl. Michowski were cleared of any criminal wrongdoing with respect to the salvage vehicle inspection program for the Defendant City.

71. Despite being cleared of any criminal wrongdoing, the Defendants City and Sollars refused to reinstate Plaintiff into his position.

72. Instead, in December 2018, the Human Resources Director for the Defendant City contacted the Plaintiff and asked if he would be

interested in meeting with officials from the Defendant City to sign an agreement, which required Plaintiff to voluntarily quit his position and agree not to sue the Defendant City or any of its officials.

73. Upon receiving this communication from the Defendant City's Human Resources Director, Plaintiff retained legal counsel, who then contacted the Defendant City's Human Resources Director.

74. Plaintiff's counsel requested advised the Defendant City's Human Resources Director that Plaintiff was interested in meeting with officials from the Defendant City to resolve this matter without having to engage in litigation, and further advised the Defendant City's Human Resources Director that Plaintiff would not be signing any agreement that would require him to forfeit any legal rights to sue the Defendants.

75. Defendants ignored Plaintiff's legal counsel's request to meet, and on December 28, 2018, Plaintiff received a letter from the Defendants informing him that he his employment as the Motor Carrier Officer was immediately terminated. (**See December 28, 2018 Termination Letter attached as Exhibit F**).

76. The Defendants City's and Sollars' actions of terminating Plaintiff's employment was in retaliation against the Plaintiff for speaking out publicly against J and M Towing and for Plaintiff having his legal

counsel issue a written response informing the Defendants of his

intentions to sue the Defendants.

77. As noted, Defendants Sollars and Remik have personal relationships

with the owner of J and M Towing and the Defendants Sollars and

Remick had plans to make J an M Towing the exclusive tower for the

Defendant City.

78. Plaintiff's negative comments about J and M Towing, which was shared

with the other members of the Taylor City Council had a detrimental

effect on Defendants Sollars' and Remik's plans to garner support from

the other members of the Taylor City Council to support making J and

M Towing the exclusive tower for the Defendant City.

79. Thus, Defendants retaliated against Plaintiff for exercising his First

Amendment Rights of free speech by having his employment

terminated.

80. As a result of the Defendants unlawful and unconstitutional actions,

Plaintiff seeks damages in excess of $2.5 million.

## COUNT III
**State-Law Defamation Claim- Defendants Ramik and Sollars
Defamed Plaintiff's Character With The False Statements Made
To The Press Falsely Accusing Plaintiff of Committing A Crime.**

81. Plaintiff incorporates, repeats, and realleges the foregoing allegations as

though they were fully set forth and stated herein.

82. This claim is brought in accordance with Michigan's defamation statute, being MCL§ 600.2911.

83. "The elements of a cause of action for defamation are (1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged publication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by the publication (defamation per quod)." *Burden v Elias Bros. Big Boy Restaurants,* 240 Mich.App. 723, 727-728; 643 NW2d 378, 381 (2000).

84. "At common law, words charging the commission of a crime are defamatory per se, and hence, injury to the reputation of the person defamed is presumed to the extent that the failure to prove damages is not a ground for dismissal." *Burden v Elias Bros. Big Boy Restaurants*, 240 Mich.App., 723, 727-728; 643 NW2d 378, 381 (2000) (citations omitted).

85. As noted, in March 2018, Plaintiff and Cpl. Michowski were approached by Chief John Blair and were asked to provide their opinions about the reputation and performance of J and M Towing and whether the

Defendant City should choose J and M Towing as the exclusive tower for the Defendant City.

86. Plaintiff advised Chief John Blair that the Defendant City should not use J and M Towing because they were untrustworthy, had questionable drivers with criminal records and Plaintiff and Cpl. Michowski had to write J and M Towing numerous tickets for violating state law and local ordinances in the past.

87. Chief John Blair shared Plaintiff's thoughts and feelings about J and M Towing with the Defendants Ramik and Sollars, along with the other members of the Taylor City Council, during a March 19, 2018 closed session.

88. After the March 19, 2018 closed session at which Chief John Blair disclosed Plaintiff's opinion regarding J and M Towing to Defendants Ramik and Sollars, Defendant Ramik began sending false and defamatory letters to the Michigan Secretary of State requesting the state to conduct a criminal investigation into the Defendant City's salvage vehicle inspection program.

89. Additionally, Defendant Ramik demanded that the Defendant Sollars also cause an internal investigation to be conducted into the salvage vehicle inspection program by the Defendant City's police department.

90. Upon information and belief, Defendant Ramik has a close relationship with the owner of J and M Towing.  In fact, Defendant Ramik has been pressuring city officials to give J and M Towing an exclusive towing contract to handle all towing for the Defendant City.

91. On March 31, 2018, Defendant Ramik met with Defendant Sollars and falsely advises Defendant Sollars that Plaintiff and Cpl. Michowski were going to be charged with felonies.

92. Upon learning of what was said by Defendant Ramik at this meeting, Plaintiff immediately contacted Defendant Sollars, who advised Plaintiff that Defendant Sollars and Defendant Ramik had met at the Tim Hortons on Allen Rd and during this meeting, Defendant Ramik informed Defendant Sollars that Plaintiff and Cpl. Michowski were going to prison.

93. On April 3, 2018, Plaintiff received a letter at his home residence from the Michigan Secretary of State informing Plaintiff that the salvage vehicle inspection program was under investigation and that an audit would be conducted based upon a complaint the Secretary of State had received from the Defendant Ramik.

94. On April 5, 2018, Plaintiff received a letter from Deputy Police Chief Richard Hopper informing Plaintiff that Plaintiff's position had been

suspended pending the outcome of the investigation. Since April 5, 2018, Plaintiff has been suspended without pay.  (**See Deputy Chief Hopper's April 5, 2018 Letter attached as Exhibit C**).

95. On April 12, 2018, the Detroit News publishes an article quoting Defendant Ramik falsely accusing Plaintiff of fraud, theft and embezzlement. (**See April 12, 2018 Detroit News article attached as Exhibit D**).

96. Notably, the April 12, 2018 Detroit News' article also quotes Defendant Sollars, who falsely states that "questionable actions may have occurred." (**See April 12, 2018 Detroit News article attached as Exhibit D**).

97. Then on April 16, 2018, Defendant Ramik went on Fox 2 News and again falsely accused Plaintiff of fraud, theft, and embezzlement. (**See April 16, 2018 Fox 2 News story attached as Exhibit E**).

98. Defendant Ramik's retaliatory antics continued with defamatory statements made in a April 21, 2018 article published in the Sunday Times newspaper, in which Defendant Ramik again falsely accused Plaintiff of fraud, theft and embezzlement.

99. The Michigan Attorney General's office conducted the criminal investigation on behalf of the Michigan Secretary of State.

100.  Plaintiff voluntarily interviewed with investigators from the Michigan Attorney General's office, which lasted for nearly 4 hours.

101.  In August 2018, Plaintiff and Cpl. Michowski were cleared of any criminal wrongdoing with respect to the salvage vehicle inspection program for the Defendant City.

102.  Defendants Ramik and Sollars retaliated against Plaintiff by causing Plaintiff to be criminally investigated by the Michigan Secretary of State and Attorney General because Plaintiff spoke out against J and M Towing, which is the towing company Defendants Ramik and Sollars are attempting to award an exclusive towing contract to on behalf of the Defendant City.

103.  Plaintiff was subject to the criminal investigation only after the Chief of Police shared Plaintiff's opinion about J and M Towing with the Defendants Ramik and Sollars and the other members of the Taylor City Council at the March 19, 2018 closed session of the Taylor City Council.

104.  Defendants Ramik and Sollars retaliated against Plaintiff because J and M Towing is the preferred choice of Defendants Ramik and Sollars to receive an exclusive towing contract with the Defendant City.

105.  Plaintiff's negative comments about J and M Towing was detrimental to J and M Towing receiving the support of the other members of the Taylor City Council.

106.  Consequently, Defendants Ramik and Sollars vowed revenge against the Plaintiff by retaliating against him by causing him to be criminally investigated by the Michigan Attorney General.

107.  Upon information and belief, Defendants Ramik and Sollars are receiving financial kickbacks from J and M Towing.

108.  These false and defamatory statements made by Defendants Ramik and Sollars have caused severe harm to Plaintiff's stellar and exemplary reputation and career.

109.  Defendants Ramik and Sollars acted with a reckless disregard for the truth in making these false and defamatory statements because Defendant Sollars knew first-hand that Plaintiff actions were lawful and done in accordance with the contract Defendant Sollars authorized and signed.

110.  Defendants Ramik's and Sollar's defamatory statements were done maliciously and with total disregard for the truth.

111.  As a result of Defendants' unlawful actions, Plaintiff seeks an award of damages in excess of $2.5 million.

## CONCLUSION AND PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Plaintiff prays that this Honorable Court GRANT the following relief:

A. Issue a declaratory judgment pursuant to 42 U.S.C. §1983 declaring that Defendants retaliated against Plaintiff for exercising his First Amendment Rights by causing Plaintiff to be criminally investigated by the Michigan Attorney General.

B. Issue a declaratory judgment pursuant to 42 U.S.C. §1983 declaring that Defendants retaliated against Plaintiff for exercising his First Amendment Rights by causing his employment to be terminated.

C. Exercise Supplemental Jurisdiction and Issue a declaratory judgment declaring Defendants defamed Plaintiff's character with false statements to press.

D. Pursuant to 42 U.S.C. §1983, award Plaintiff damages in excess of $2.5 million dollars for Defendants retaliating against Plaintiff for exercising his Frist Amendment Rights.

E. Award Plaintiff damages in excess of $2.5 million for Plaintiff's defamation claim against the Defendants.

F. Grant any further relief the Court deems appropriate, just and proper.

Dated: January 23, 2019                  Respectfully submitted,

                                        */s/ ANDREW A. PATERSON*
                                        ANDREW A. PATERSON (P18690)
                                        Attorney for Plaintiff
                                        2893 E. Eisenhower Pkwy
                                        Ann Arbor, MI 48108
                                        (248) 568-9712
                                        aap43@outlook.com

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**PATRICK RABOCZKAY,**

        Plaintiff,                             **Case No. 19-cv-**
                                                   **HON.**

v.

**CITY OF TAYLOR,**
**HERMAN "BUTCH" RAMIK**, in his individual and official capacities as an elected member of the Taylor City Council, and
**RICK SOLLARS,** in his individual and official capacities as the elected Mayor of the City of Taylor**,**

        Defendants.
_____/
ANDREW A. PATERSON (P18690)
Attorney for Plaintiff
2893 E. Eisenhower Pkwy
Ann Arbor, MI 48108
(248) 568-9712
aap43@outlook.com
_____/

## DEMAND FOR JURY TRIAL

       NOW COMES PLAINTIFF, PATRICK RABOCZKAY ("**Plaintiff" or**

**"Plaintiff Raboczkay**"), by and through his attorney, ANDREW A. PATERSON,

and pursuant to Fed.R.Civ.P. 38, hereby demands a jury trial on all the issues so

triable by a jury as pled in Plaintiff's complaint.

Dated: January 23, 2019            Respectfully submitted,

                               */s/ ANDREW A. PATERSON*
                               ANDREW A. PATERSON (P18690)
                               Attorney for Plaintiff