UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PATRICK RABOCZKAY,

      Plaintiff,                                   Case No. 19-10255

vs.                                           HON. MARK A. GOLDSMITH

CITY OF TAYLOR, et al.

      Defendants.

_____/

## OPINION & ORDER
### (i) GRANTING IN PART DEFENDANT RICK SOLLARS'S MOTION TO DISMISS (Dkt. 40), (ii) GRANTING IN PART DEFENDANT HERMAN RAMIK'S MOTION TO DISMISS (Dkt. 41), (iii) AND GRANTING DEFENDANT CITY OF TAYLOR'S MOTION TO DISMISS (Dkt. 42)

Former City of Taylor police chief John Blair approached Plaintiff Patrick Raboczkay, a retired Taylor police officer, and asked whether he thought J and M Towing should be awarded the City's exclusive towing contract. Based on his experience as a police officer, Raboczkay told Blair that J and M Towing was untrustworthy and had questionable drivers with criminal records. Blair relayed this information to Defendants Rick Sollars (Mayor of Taylor), and Herman Ramik (a Taylor city council member). According to Raboczkay, Sollars and Ramik received "kick backs" from J and M Towing, and they retaliated against Raboczkay for his statement by causing criminal investigations into his work as a Taylor salvage vehicle inspector and making false public statements about him in the press. Sollars, Ramik, and Defendant City of Taylor have all filed motions to dismiss (Dkts. 40-42). The matters are fully briefed. For the reasons discussed below, Sollars's and Ramik's motions are granted in part; the City of Taylor's motion is granted.

# I.    BACKGROUND

The following allegations are taken as true for the purposes of the pending motions. Raboczkay served as a City of Taylor police officer from 1997 through 2017. 2d Am. Compl. ¶ 11 (Dkt. 39). He retired in October 2017. Id. ¶ 19. Shortly after his retirement, Raboczkay entered into a personal service contract with the City of Taylor and Defendant Sollars to serve as the "CMV Weigh Master/Motor Carrier Officer," performing salvage vehicle inspections on behalf of the City. Id. ¶¶ 13-20. For a fee, salvage vehicle inspectors verify that salvaged vehicles do not contain any stolen parts and that the vehicles are street worthy. 4/12/2018 Detroit News Article, Ex. D to Compl. (Dkt. 6-3).

In March 2018, after working hours, then police chief John Blair approached Raboczkay and one of his colleagues to inquire about non-party J and M Towing's reputation. 2d Am. Compl. ¶ 25. The City was considering making J and M Towing its exclusive towing service. Id. Blair did not seek Raboczkay's opinion as the City's CMW Weigh Master, but rather sought his opinion as a private citizen "off the record." Id. ¶¶ 25-30. Raboczkay told Blair that J and M Towing was not trustworthy and had questionable drivers with criminal records. Id. ¶ 31.

Blair subsequently shared Raboczkay's opinion with the City Council, where Sollars and Ramik were in attendance. Id. ¶ 32. After the city council meeting, Ramik began sending false and defamatory letters to the Michigan Secretary of State requesting a criminal investigation into the City's salvage vehicle inspection program; he also urged Sollars to initiate an investigation. Id. ¶ 35. According to Raboczkay, Ramik has a close relationship with J and M Towing and had been pressuring the City to award J and M Towing its exclusive towing contract. Id. ¶ 36. Raboczkay alleges that Ramik falsely advised Sollars that Raboczkay and his colleague were "going to prison." Id. ¶ 38.

In April, the Michigan Secretary of State informed Raboczkay that, based on Ramik's complaint, the salvage vehicle inspection program was under investigation. Id. ¶ 39. Raboczkay's position was suspended pending the outcome of the investigation. Id. ¶ 40. In a statement to the Detroit News, Ramik said that he blew the whistle on two former Taylor police officers, alleging that they had committed fraud by not turning over vehicle-salvage-inspection fees to the City. 4/12/2018 Detroit News Article. In the same article, Blair noted that his department was cooperating with the Secretary of State; the article also quoted Sollars as stating that "concerns were raised that some questionable actions may have occurred" and that "while this investigation is ongoing, the two officers have been placed on administrative leave until further notice." Id. A few days later, Ramik appeared on Fox 2 News and again falsely accused Raboczkay of fraud, theft, and embezzlement. 2d Am. Compl. ¶ 43.

In August 2018, Raboczkay was cleared of any criminal wrongdoing with respect to the vehicle salvage inspection program. Despite being cleared, Raboczkay was not reinstated into his previous position. Id. ¶ 98. In December, the City's Human Resources Department offered to meet with Raboczkay about entering into a voluntary agreement to resign his position and agree not to sue the City or its officials. Id. ¶ 99. Raboczkay's attorney contacted the City to resolve matters and to avoid litigation, but the City ignored the request and terminated Raboczkay's employment on December 28, 2018. Id. ¶¶ 99-102. Raboczkay alleges that Sollars ordered the Human Resources Department to terminate Raboczkay's employment. Id. ¶ 103. According to Raboczkay, Sollars and Ramik receive financial "kick backs" from J and M Towing, and their actions against Raboczkay were retaliation for speaking out against J and M Towing and threatening to bring this action against them. Id. ¶¶ 56, 104-105.

Raboczkay filed this action alleging First Amendment retaliation, violation of the Fourteenth Amendment's Equal Protection Clause, and a state law defamation claim against Defendants Sollars and Ramik. There are no claims brought against Defendant City of Taylor. Sollars, Ramik, and the City of Taylor all filed motions to dismiss (Dkts. 40-42) under Federal Rule of Civil Procedure 12(b)(6).

## II. STANDARD OF REVIEW

On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "[t]he defendant has the burden of showing that the plaintiff has failed to state a claim for relief." Directv, Inc. v. Treesh, 487 F.3d 471, 476 (6th Cir. 2007) (citing Carver v. Bunch, 946 F.2d 451, 454-455 (6th Cir. 1991)), cert. denied, 552 U.S. 1311 (2008). To survive a Rule 12(b)(6) motion, the plaintiff must allege sufficient facts to state a claim to relief above the speculative level, such that it is "plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). The plausibility standard requires courts to accept the alleged facts as true, even when their truth is doubtful, and to make all reasonable inferences in favor of the plaintiff. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Twombly, 550 U.S. at 555-556.

Evaluating a complaint's plausibility is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679. Although a complaint that offers no more than "labels and conclusions," a "formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement" will not suffice, id. at 678, it need not contain "detailed factual allegations," Twombly, 550 U.S. at 555; see also Erickson v. Pardus, 551 U.S. 89, 93 (2007) ("[S]pecific facts are not necessary . . . ."). Rather, a complaint needs only enough facts to suggest that discovery may

reveal evidence of illegality, even if the likelihood of finding such evidence is remote. Twombly, 550 U.S. at 556.

## III.     ANALYSIS

Defendants argue that Raboczkay has failed to state a claim for First Amendment retaliation, Equal Protection, and defamation. In his response brief, Raboczkay agrees to dismiss his Equal Protection claim. Resp. at 27 (Dkt. 46). The First Amendment and defamation claims will be taken in turn.

### A. First Amendment Retaliation

To survive a motion to dismiss a claim under 42 U.S.C. § 1983, a plaintiff must allege two elements: (1) the defendant acted under color of state law; and (2) the defendant's conduct deprived the plaintiff of rights secured under federal law. Bloch v. Ribar, 156 F.3d 673, 677 (6th Cir. 1998). Defendants do not dispute that Raboczkay alleged that Sollars and Ramik were acting under the color of state law. Defendants dispute whether Raboczkay has been deprived any right secured under federal law.

To establish a First Amendment retaliation claim, the plaintiff must show "'(1) he was engaged in a constitutionally protected activity; (2) he was subjected to adverse action or deprived of some benefit; and (3) the protected speech was a 'substantial' or 'motivating factor' in the adverse action.'" Haddad v. Gregg, 910 F.3d 237, 243 (6th Cir. 2018) (quoting Farhat v. Jopke, 370 F.3d 580, 588 (6th Cir. 2004)). Defendants argue that Raboczkay has not alleged the first two prongs, but they concede the causation prong by failing to address it.

### 1.      Protected Activity

Defendants argue that Raboczkay was speaking as a public employee when he made his statements to Police Chief Blair. Ramik Mot. at 9 (Dkt. 41); Sollars Mot. at 10 (Dkt. 40). Public

employees, like Raboczkay, are somewhat less protected in the First Amendment retaliation context. For the speech to be protected, a public employee "(1) must have spoken 'as a citizen,' and (2) must have addressed matters of public concern." Weisbarth v. Geauga Park Dist., 499 F.3d 538, 542 (6th Cir. 2007) (some internal marks omitted). Public employees are not considered to be engaging in protected activity when they make statements within the scope of their official duties. Garcetti v. Ceballos, 547 U.S. 410, 421 (2006). To determine whether Raboczkay was speaking as a citizen, the critical question is "whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." Lane v. Franks, 573 U.S. 228, 240 (2014). Defendants do not dispute that Raboczkay's statement is a matter of public concern.

This public employee/private citizen distinction is "challenging," and "although the Supreme Court has not identified any detailed analysis to decide this question," the inquiry is meant to be a practical one. Haddad, 910 F.3d at 247 (citing Mayhew v. Town of Smyrna, Tennessee, 856 F.3d 456, 464 (6th Cir. 2017)). The Sixth Circuit has identified several factors, including "the impetus for [the] speech, the setting of [the] speech, the speech's audience, and its general subject matter." Weisbarth, 499 F.3d at 546. Raboczkay alleges that Blair sought his opinion about J and M Towing outside of work on a matter of public concern unrelated to his job duties. These factors weigh in Raboczkay's favor.

Defendants rely heavily on Weisbarth to support their position that Raboczkay was speaking in furtherance of his ordinary job responsibilities. Sollars Mot. at 10-12; Taylor Mot. at 6-8 (Dkt. 42). In Weisbarth, the plaintiff worked as a park ranger for Geauga Park District ("GPD"). 499 F.3d at 539. GPD hired a consultant to evaluate its "serious morale and performance problems." Id. at 540. The consultant rode along with the plaintiff during one of her shifts. Id.

Based on inquiry by the consultant, the plaintiff expressed her personal dislike for nearly all her co-workers.  Id.  The consultant identified the plaintiff as a "source of friction" within the GPD, and she was later terminated.  Id.

The Weisbarth plaintiff brought a First Amendment retaliation claim against her employer based exclusively on her statements made during the consultant's ride-along.  Id.  The plaintiff emphasized that the consultant was hired by GPD specifically to evaluate and interview its employees.  Id. at 543.  The Sixth Circuit explained that although the plaintiff's speech was not strictly within her job description as a park ranger, the speech corresponded directly to her professional responsibilities.  Id. at 545-546.  The panel found that the plaintiff's statement on issues pertaining to employee morale, specifically elicited by the plaintiff's employer, was speech made as an employee pursuant to her official duties.  Id.

Here, unlike the Weisbarth plaintiff, Raboczkay emphasizes that his comments were made outside of work, on matters not related to his job duties.  2d Am. Compl. ¶¶ 25-30.  Defendants argue that these allegations are implausible because Raboczkay was speaking to his direct supervisor about a company that works directly with vehicles in the City that needed to be "salvaged."  Taylor Mot. at 8.[1]  Blair may have been Raboczkay's direct supervisor, but there are no allegations that tow companies regularly bring salvaged vehicles to Raboczkay for certification such that his position provided special insight into towing operations.  Further, Raboczkay alleges that his opinion, at least in part, was formed while he was serving as a Taylor police officer.  2d Am. Comp. ¶ 31. And Raboczkay was employed as a salvage inspector, not a police officer, when he spoke with Blair.  Therefore, Weisbarth does not help Defendants in this matter.

---

[1] It is not clear what "salvaged" means in the context of certifying that vehicles have been legally restored to operational status.

Raboczkay has alleged sufficiently that he was speaking as a citizen to Blair on a matter of public concern.

### 2. Adverse Action

Ramik argues that he did not take an adverse action against Raboczkay, because he lacks the authority to terminate his employment. Ramik Mot. at 11. That may be true, but termination is not the only adverse action Raboczkay alleges.

An action is adverse if it "would deter a person of ordinary firmness from continuing to engage in that conduct." Fritz v. Charter Twp. of Comstock, 592 F.3d 718, 723 (6th Cir. 2010) (citations omitted). "Whether an alleged adverse action is sufficient to deter a person of ordinary firmness is generally a question of fact." Wurzelbacher v. Jones-Kelley, 675 F.3d 580, 583-584 (6th Cir. 2012) (citing Bell v. Johnson, 308 F.3d 594, 603 (6th Cir. 2002)).

Raboczkay alleges that Ramik made false statements to Michigan's Secretary of State that Raboczkay had been committing fraud. The investigation caused the City to place Raboczkay on administrative leave. Additionally, Ramik made repeated statements to the press describing how Raboczkay defrauded the City out of hundreds of thousands of dollars over the course of two to three years. See 4/12/2018 Detroit News Article ("I did some snooping around, and found out these officers weren't turning in the money for these inspections. At $100 apiece, there are thousands of these that have not been turned in, going back two and three years."); see also 2d Am. Compl. ¶¶ 43-44 (alleging Ramik made statements to Fox 2 News and the Sunday Times). Publicizing facts damaging to a person's reputation and instigating a criminal investigation are actions that would deter a person of ordinary firmness from making comments on matters of public

concern.  Fritz, 592 F.3d at 724.  Raboczkay has alleged an adverse action sufficient to maintain his First Amendment retaliation claims.[2]

**B.  Defamation**

Raboczkay alleges that Sollars defamed him by writing a letter to city officials noting that "questionable actions may have occurred" with respect to the vehicle salvage investigation.  2d. Am. Compl. ¶ 146.  Raboczkay further alleges that Ramik defamed him by (i) calling him a "crook" and a "thief" during a city council meeting, id. ¶ 154; (ii) sending false and defamatory letters to the Michigan Secretary of State requesting a criminal investigation, id. ¶ 134; (iii) advising Sollars that Raboczkay was going to be charged with felonies, id. ¶¶ 135, 137-138; (iv) accusing him publicly of fraud, theft, and embezzlement in the Detroit News, on Fox 2 News, and in the Sunday Times; and (v) again accusing Raboczkay publicly of criminal conduct in the Detroit News, even after Raboczkay had been cleared of any wrongdoing, id. ¶¶ 151-152, 157.

There are four elements necessary to establish defamation under Michigan law:

(1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication.

---

[2] Ramik also argues that because Raboczkay failed to allege that the State investigation against him lacked probable cause, he cannot sustain an action for retaliatory prosecution.  Ramik Mot. at 12.  However, Raboczkay is not alleging retaliatory prosecution.  Therefore, he did not need to allege the investigations lacked probable cause.  Ramik also argues that Raboczkay fails to state a claim because he does not support his assertion that Ramik and J and M Towing have a "close personal relationship."  Id. at 12-13.  But Raboczkay has done more than make unsupported allegations.  He also alleges that Ramik had been pressuring the City Council to make J and M Towing its exclusive towing service and that Ramik was receiving "kick backs" from J and M Towing.  These detailed factual allegations are specific enough to survive a motion to dismiss. See Twombly, 550 U.S. at 555.

Smith v. Anonymous Joint Enter., 793 N.W.2d 533, 540 (Mich. 2010) (citation omitted). Defendants do not address the third and fourth prongs. The first two prongs will be taken in turn.

### 1. False and Defamatory Statement Concerning the Plaintiff

Raboczkay alleges adequately that Ramik made false and defamatory statements concerning Raboczkay, but he fails to do so with respect to Sollars.

Raboczkay alleges that Ramik's criminal conduct accusations are false and defamatory. Raboczkay's allegation that Ramik made false statements is sufficient to survive a motion to dismiss, and accusations of criminal conduct are defamatory per se, see Burden v. Elias Bros. Big Boy Restaurants, 613 N.W.2d 378, 381 (Mich. Ct. App. 2000).

However, Ramik argues that publicly accusing "two Taylor police officers" of criminal conduct is "too ambiguous for anyone—without more—to have suspected that Plaintiff was the subject of the news features." Ramik Mot. at 16. To support his argument Ramik relies on Action Auto Glass v. Auto Glass Specialists, No. 1:00-CV-756, 2001 WL 1699205 (W.D. Mich. Aug. 21, 2001) (citing Lins v. Evening News Ass'n, 342 N.W.2d 573 (Mich. Ct. App. 1983)). Neither of these cases, both decided after extensive discovery, is persuasive.

As recognized in Lins, where a small group is defamed and the "plaintiff's identity is readily ascertainable from the content of the publication," a defamation action can be maintained. Lins, 342 N.W.2d at 578. Here, the allegations do not establish whether Raboczkay was one of two vehicle salvage inspectors whose identity was, therefore, readily identifiable from the news articles or whether he was one of a hundred vehicle salvage inspectors whose identity could not be gleaned from Ramik's public comments. Unlike Action Auto Glass or Lins, cases decided after extensive discovery, Ramik's motion is limited to the pleadings. Based on the pleadings, Raboczkay has made sufficient allegations that he was readily identifiable in the media reports.

Ramik also argues that Raboczkay has failed to set forth, verbatim, the defamatory words in the Second Amended Complaint. Ramik Mot. at 15-16. Although it is true that defamation claims must be pleaded with specificity, <u>Ledl v. Quik Pik Food Stores, Inc.</u>, 589-590, 349 N.W.2d 529, 532 (Mich. Ct. App. 1984), slander claims (the spoken form of defamation) often cannot be recalled verbatim and, therefore, it is sufficient to plead the substance of the slanderous statement, <u>Royal Palace Homes, Inc. v. Channel 7 of Detroit, Inc.</u>, 495 N.W.2d 392, 395 (Mich. Ct. App. 1992). Raboczkay has pleaded that Ramik accused him of fraud, theft, and embezzlement, which is the substance of Ramik's slanderous statements. Thus, Raboczkay's allegations against Ramik satisfy the first prong.

Sollars, on the other hand, has not made any false statements concerning Raboczkay. Raboczkay alleges that, in a letter to Ramik and other city officials, Sollars acknowledged that the Secretary of State was conducting an audit of the vehicle salvage program and that two police officers had been suspended. The Detroit News quoted Sollars in an April 12, 2018 article:

> 'After reviewing some of the files and documents, concerns were raised that some questionable actions may have occurred,' Sollars wrote. 'Therefore, while this investigation is ongoing, the two officers have been placed on administrative leave until further notice.'

4/12/2018 Detroit News Article. There is no dispute that Ramik raised concerns over questionable actions allegedly taken by Raboczkay and that Raboczkay was placed on administrative leave. Raboczkay's defamation claim against Sollars fails at the first prong because Sollars's statement was true. Truth is an absolute defense to a defamation claim. <u>Porter v. Royal Oak</u>, 542 N.W.2d 905, 909 (Mich. App. Ct. 1995) (citing cases). Because Raboczkay did not allege a false statement by Sollars, his defamation claim against Sollars must be dismissed.

### 2. Unprivileged Communication to a Third Party

There is no question that Ramik's statements were made to third parties, but whether Ramik's statements were privileged is another matter. For the reasons discussed below, it is clear that absolute immunity attaches to Ramik's statement calling Raboczkay a "crook" and a "thief" during a city council meeting, but not to his communications to Michigan's Secretary of State.

Absolute privilege is a narrow privilege that extends to, among other things, communications made during legislative proceedings, including city council meetings, on matters of public concern. Froling v. Carpenter, 512 N.W.2d 6, 8-9 (Mich. Ct. App. 1993) (citing cases). The rationale for the privilege is to allow persons to express their views boldly during legislative proceedings on matters of public concern and without fear of legal repercussions. Id. at 8. There is no dispute that Ramik made his comment during a legislative proceeding on a matter of public concern (alleged corruption). Therefore, Ramik's statement was protected by absolute privilege and cannot form a basis for recovery in this action. See Schlinkert v. Henderson, 49 N.W.2d 180, 183 (Mich. 1951).

Ramik also believes that his communications to Michigan's Secretary of State are protected by absolute privilege. He argues that it is well settled that his communications to Michigan's Secretary of State, as an investigatory agency, are protected by absolute privilege. He is mistaken. "'Cases of absolute privilege are not numerous, and the courts refuse to extend their number. They are divided into three classes. (1) Proceedings of legislative bodies; (2) Judicial proceedings; and (3) Communications by military and naval officers.'" Timmis v. Bennett, 89 N.W.2d 748, 751 (Mich. 1958) (quoting Newell, Slander and Libel (4th ed.), § 351). Ramik's communications to Michigan's Secretary of State do not fall into any of these categories. See id. at 753 (noting that

the absolute privilege attached to judicial proceedings does not apply when a case is merely being contemplated, because no judicial proceeding is pending).

However, Michigan courts have considered applying absolute privilege in a fourth context: communications to police officers concerning criminal activity. This fourth context has its genesis in Shinglemeyer v. Wright, 82 N.W. 887, 890-891 (Mich. 1900). In Shinglemeyer, the Michigan Supreme Court left open the possibility that "malicious" statements made to police officers may be actionable in defamation actions. Id. at 890. Michigan courts recognize that communications to police officers are privileged, but they have equivocated, based on Shinglemeyer, whether that privilege is qualified or absolute. See Hall v. Pizza Hut of Am., Inc., 396 N.W.2d 809, 813 (Mich. Ct. App. 1986) (stating that "information given to police officers regarding criminal activity is absolutely privileged," but finding that the plaintiff's communication to police officers "enjoyed at least a qualified privilege"); compare Smith v. Primco Mgmt. Corp., No. 193207, 1997 WL 33344476, at *3 (Mich. Ct. App. July 15, 1997) (concluding "that no more than a qualified privilege attaches to communications made to police officers concerning criminal activity"), with Eddington v. Torrez, 874 N.W.2d 394, 397 (Mich. Ct. App. 2015) ("The simple fact is that Shinglemeyer created an absolute privilege covering any report of criminal activity to law enforcement personnel in the context of a defamation claim, and Shinglemeyer remains the law.").

Ramik relies on the cases finding that absolute privilege attaches to communications with law enforcement officers on criminal matters. But the Michigan Supreme Court has not endorsed such an extension of the privilege. However, the split does not need to be decided in this case, because Ramik did not make his communications to police officers. Ramik communicated with the Secretary of State, and Michigan courts have been reluctant to extend the privilege to communications about criminal activity to anyone other than police officers. See Schmizzi v.

<u>Borrajo</u>, No. 248578, 2004 WL 2451932, at *1 (Mich. Ct. App. Nov. 2, 2004) (declining to extend absolute privilege to communications with Michigan's Secretary of State accusing an individual of criminal activity). Ramik's communications to the Secretary of State about Raboczkay's alleged criminal activity enjoy, at most, a qualified privilege. However, Ramik has not argued that his communications enjoyed a qualified privilege and, therefore, the matter cannot be resolved by Ramik's motion to dismiss. With the exception of Ramik's statement to the city council, none of his statements was protected by absolute privilege.

Ramik's motion is granted in part as to the statement made during the city council meeting.

**C. City of Taylor**

Raboczkay named the City of Taylor in the Second Amended Complaint, but, as noted by the City, he failed to make any allegations against the City. In the response brief, Plaintiff's attorney, Andrew Paterson, has thoughtlessly lifted a response from another one of his cases, <u>Anders v. Lievens</u>, No. 18-13942, including using Anders's name, and has made representations in this case that simply are not true. For example, in support of a <u>Monell</u> claim that has not been alleged, Andrew Paterson represents that the Second Amended Complaint "cites the Defendant City's charter repeatedly as the 'policy or custom' that is the 'moving force of the constitutional violation'" Resp. at 17. However, the words "policy," "custom," and "<u>Monell</u>" do not appear anywhere in Raboczkay's Second Amended Complaint, and there is no <u>Monell</u> claim in Raboczkay's four-count complaint. The City of Taylor's motion to dismiss is granted.

**IV. CONCLUSION**

For the foregoing reasons, Sollars's motion to dismiss (Dkt. 40) is granted in part. Raboczkay's defamation claim against Sollars is dismissed. The motion is denied in all other respects. Ramik's motion to dismiss (Dkt. 41) is granted in part. Raboczkay's defamation claim,

to the extent it is based on Ramik's comments during a city council meeting, is dismissed. The motion is denied in all other respects. The City of Taylor's motion to dismiss is granted (Dkt. 42). Raboczkay withdrew his Equal Protection claim and it is, therefore, dismissed.

     SO ORDERED.

Dated:  November 22, 2019                    s/Mark A. Goldsmith
         Detroit, Michigan                    MARK A. GOLDSMITH
                                    United States District Judge