UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PATRICK RABOCZKAY,

        Plaintiff,

vs.

TAYLOR, CITY OF, et al.

        Defendants.

_____/

Civil Action No.
19-cv-10255

HON. MARK A. GOLDSMITH

**OPINION & ORDER
(1) GRANTING SOLLARS'S MOTION FOR SUMMARY JUDGMENT (Dkt. 98); (2)
GRANTING IN PART AND DENYING IN PART RAMIK'S MOTION TO DISMISS
AND FOR SUMMARY JUDGMENT (Dkt. 99); AND (3) GRANTING RAMIK LEAVE
TO FILE A MOTION FOR SUMMARY JUDGMENT ON THE DUE PROCESS CLAIM**

This is a 42 U.S.C. § 1983 lawsuit brought by Plaintiff Patrick Raboczkay against

Defendants Rick Sollars and Herman ("Butch") Ramik.[1]  Raboczkay, a former City of Taylor

employee, brings First Amendment retaliation claims against Sollars (the City's mayor) and Ramik

(a councilman).  Raboczkay also brings a due process claim and a defamation claim against Ramik.

This matter is presently before the Court on Sollars's motion for summary judgement (Dkt. 98)

and Ramik's motion to dismiss and for summary judgment (Dkt. 99).  For the reasons that follow,

---

[1] Originally, the City of Taylor was named as an additional defendant in this lawsuit.  However,
the City was dismissed as a defendant due to Raboczkay's failure to plead a <u>Monell</u> claim against
the City, <u>see</u> 11/22/19 Op. at 14 (Dkt. 53), which is the equivalent of a claim against a public
employee in his official capacity, <u>Matthews v. Jones</u>, 35 F.3d 1046, 1049 (6th Cir. 1994).  After
the City was dismissed, the Court granted Raboczkay leave to file a third amended complaint in
order to add a due process claim against Ramik.  <u>See</u> 11/10/20 Op. (Dkt. 94).  The Court did not
grant Raboczkay leave to amend his complaint to add any <u>Monell</u> claims.  Nevertheless,
Raboczkay brings the instant federal claims against Sollars and Ramik in their individual <u>and</u>
official capacities.  The Court notes that the official capacity claims have already been dismissed
from this action.  <u>See</u> 11/22/19 Op. at 14.

1

Sollars's motion is granted.  Ramik's motion is granted as to his request for summary judgment on the defamation and First Amendment claims against him but is denied as to his request for dismissal of the due process claim against him.

## I.  BACKGROUND

From October 1997 to October 2017, Raboczkay served as a police officer for the City of Taylor.  Raboczkay Dep. at 6 (Dkt. 99-3).  Around November 2016, Raboczkay began a secondary position performing salvage vehicle inspections on behalf of the City.  Id. at 14.  When Raboczkay retired from the police department in October 2017, he entered into a personal service contract to continue to perform the salvage vehicle inspections on behalf of the City as the "CMV Weigh Master/Motor Carrier Officer."  Letter of Employment (Dkt. 99-4).

This position continued his interaction with John Blair, the chief of police, as his letter of employment required him to "perform Commercial Vehicle Enforcement and other functions and duties as assigned by the Chief of Police."  Id. ¶ 2.  In tandem with his motor carrier role, the City and the police department agreed, at the same time, to sponsor Raboczkay as a salvage inspector for the state of Michigan and to compensate Raboczkay with 100% of the fees that he collected performing salvage vehicle inspections while "off duty as secondary employment."  Sponsor Letter (Dkt. 95-2).

In March 2018, Raboczkay and Ted Michowski—a police officer who, at the time, also performed salvage vehicle inspections for the City—were approached by Blair, who asked Raboczkay's opinion regarding a towing vendor, J&M Towing.  Raboczkay Dep. at 27; Blair Aff. ¶ 3 (Dkt. 99-6).[2]  On or about March 19, 2018, Blair disclosed Raboczkay's statements that J&M

---

[2] Neither Raboczkay's complaint, Raboczkay's deposition testimony, nor Blair's affidavit specifies the exact date of Blair and Raboczkay's conversation.

was not reputable and had received numerous tickets during a city council session where Ramik and Sollars were present.  Ramik Dep. at 7 (Dkt. 99-2).[3]

Around March 2018, Ramik heard through the police department grapevine that salvage inspection fees were not being turned over to the City; Ramik attempted to find records confirming that fees from the City's salvage vehicle inspection program had been handed over to the City, but he was unable to find any such records.  Id. at 9, 38–40.[4]  Ramik contacted the Michigan Secretary of State to call for an investigation into the City's salvage vehicle inspection program to investigate potential embezzlement or similar violations of state law.  Id. at 7.[5]

Raboczkay alleges that on April 3, 2018, he received a letter from the Michigan Secretary of State informing him that the salvage vehicle inspection program was under investigation, and that an audit would be conducted based upon a complaint that the Secretary had received from Ramik.  3d Am. Compl. ¶ 38.  The state criminal investigation was led by Pete Ackerly, a special agent of the public integrity unit of the Michigan Attorney General's Office.  Ackerly Dep. at 9 (Dkt. 99-5).

The City's police department also conducted an internal investigation into the salvage vehicle inspection program.  On April 5, 2018, Raboczkay received a letter from the deputy chief

---

[3] In his deposition, Sollars could not recall the alleged discussion on March 19, 2018 in which Blair disclosed Raboczkay's comments about J&M.  Sollars Dep. at 19–20 (Dkt. 99-8).

[4] Under the agreement with the City, the salvage inspection fees collected by Raboczkay were to be deposited "in the salvage vehicle account."  Sponsor Letter.

[5] Raboczkay alleges that Ramik contacted the Secretary of State after March 19, 2018.  3d Am. Compl. ¶ 33.  However, in his deposition, Ramik was unable to recall whether he contacted the Michigan Secretary of State before or after March 19, 2018.  Ramik Dep. at 7–8.

of police, Richard Hooper, informing Raboczkay that he was being suspended without pay pending the outcome of the City's investigation.  Suspension Letter (Dkt. 99-7).

On April 12, 2018, the Detroit News published an article entitled "2 Taylor Cops on Leave in Probe of Auto Inspection Fees."  4/12/18 Detroit News Article (Dkt. 95-4).  The article quotes Ramik on the subject of the missing salvage vehicle inspection fees:

> Councilman Herman "Butch" Ramik, a former Taylor police officer, said he blew the whistle on the alleged fraud when he discovered the two cops weren't turning in $100 fees paid to inspect salvaged vehicles.
>
> . . .
>
> "I started hearing from people I know, asking why our cops were in Detroit and Ann Arbor doing inspections," Ramik said. "I did some snooping around, and found out these officers weren't turning in the money for these inspections. At $100 apiece, there are thousands of these that have not been turned in, going back two and three years."

Id. at PageID.1177–1178.

On April 16, 2018, Ramik went on Fox 2 News to discuss the investigation.  3d Am. Compl. ¶ 42; Ramik Statement of Material Facts (SOMF) ¶ 12.  During that interview, Ramik stated, among other things, "At this time there is no money to be found and I checked thoroughly on it."  3d Am. Compl. ¶ 101.  On April 21, 2018, the Down River Sunday Times also published an article that quoted Ramik on the topic.  Id. ¶ 103; Ramik SOMF ¶ 13.  That article states, "Ramik said it seemed the two officers did inspections . . . but did not turn in the fees they collected to the city . . ." and quotes Ramik as stating, "I told the council, 'Show me the money,' . . . 'As of right now, there is no money to be found.'"[6]

---

[6] Sue Suchyta, Down River Sunday Times, "Taylor police officer, retired officer under investigation for allegedly keeping salvage inspection fees," https://www.downriversundaytimes.com/2018/04/21/taylor-police-officer-retired-officer-under-investigation-for-allegedly-keeping-salvage-inspection-fees/ [https://perma.cc/DS9N-YS3N].

The state criminal investigation concluded in August 2018.  As Sollars points out, Ackerly's investigation report documents that Raboczkay had likely been performing salvage vehicle inspections while he was working on duty as the motor carrier officer—rather than off duty as agreed—because Raboczkay had billed for inspections conducted on time frames that would be impossible or unlikely to complete entirely off duty.  Sollars SOMF ¶ 16c (citing Ackerly Report at PageID.1732 (Dkt. 98-8)).  Nevertheless, Raboczkay contends that he and Michowski were "cleared of any criminal wrongdoing" by the criminal investigation because the Attorney General's Office decided not to prosecute Raboczkay for violating Mich. Comp. Laws § 257.217c (requiring that salvage fees must first go to the police department before the inspector is compensated).  Raboczkay Statement of Additional Material Facts ("SAMF") ¶ 19 (Dkt. 114) (citing Ackerly Dep. at 43–44).  Raboczkay's characterization of the outcome of the state criminal investigation is undercut by Ackerly's deposition testimony; when asked whether he agreed that Raboczkay was cleared of any wrongdoing, Ackerly answered that, based on his investigation, he believed that Raboczkay had violated Mich. Comp. Laws § 257.217c.  Ackerly Dep. at 45.

Raboczkay's employment was terminated on December 28, 2018, Termination Letter (Dkt. 99-10), resulting in the filing of this action in January 2019, see Compl. (Dkt. 1).  As Sollars puts it, Raboczkay was terminated because City officials determined that "Plaintiff's practice of performing salvage vehicle inspections on 'City of Taylor time' was, on balance, a fireable offense."  Sollars SOMF ¶ 18.

Five months after filing this lawsuit, Raboczkay's counsel sent an email to Sheila Gorski, the director of human resources and risk management for the City, requesting that a public "name-clearing" hearing be scheduled so that Raboczkay could refute the allegedly defamatory statements made by Ramik in conjunction with Raboczkay's termination.  3d Am. Compl. ¶¶ 64–65; 6/16/19

Request (Dkt. 99-12).  The City's counsel responded with an email denying the request, allegedly

after being directed and authorized to do so by Ramik.  3d Am. Compl. ¶¶ 66–68; 6/18/19 Denial

(Dkt. 99-13).

As the pleadings now stand, Raboczkay brings two counts of First Amendment retaliation

against Ramik and Sollars, which are based on two retaliatory actions: (i) causing the state criminal

investigation and (ii) causing Raboczkay's employment to be terminated.  3d Am. Compl. ¶¶ 8–

55, 72–86.[7]  However, in his response to Sollars's motion for summary judgment, Raboczkay

appears to abandon his theory that Sollars caused the state criminal investigation.  Instead,

Raboczkay argues that "[t]he adverse actions Defendant Sollars took against the Plaintiff were

suspending Plaintiff without pay and subsequently authorizing Plaintiff's employment."  Resp. to

Sollars Mot. for Summ. J. (MSJ) at 31 (Dkt. 114).[8]  As for why Defendants would have been

motivated to retaliate against Raboczkay for his comments about J&M, Raboczkay hypothesizes

in his complaint that (i) "Ramik has a close relationship with the owner of J and M Towing" and,

as a result, "Ramik ha[d] been pressuring city officials to give J and M Towing an exclusive towing

---

[7] Although the Court acknowledged in its November 22, 2019 opinion that "[p]ublicizing facts damaging to a person's reputation" can be a retaliatory action, 11/22/19 Op. at 8, in his third amended complaint, filed on November 12, 2020, Raboczkay does not base either of his First Amendment retaliation counts on Ramik's publication of information to the media.  Nor does Raboczkay argue in his response to Ramik's motion that he intended to bring his retaliation counts based on such a theory.

[8] Raboczkay's new argument that Sollars suspended Raboczkay without pay is not set forth in his complaint; to the contrary, in his complaint, Raboczkay alleged that the suspension was made by the police department.  See 3d Am. Compl. ¶ 39 (alleging that the suspension letter was sent by the deputy police chief); Suspension Letter (sent on police department letterhead).  Because a plaintiff may not amend his complaint by adding factual allegations as a part of a response in opposition to a motion for summary judgment, see, e.g., Orea Energy Group, LLC v. East Tenn. Consultants, Inc., No. 3:09–CV–041, 2009 WL 3246853 at *3 (E.D. Tenn. Oct. 6, 2009), the additional allegations made by Raboczkay in his response cannot form the basis for a claim against Sollars, see Laporte v. City of Nashville, No. 3:18-cv-00282, 2019 WL 845413 at *3 (M.D. Tenn. Feb. 21, 2019).

contract to handle all towing for the City of Taylor"; and (ii) Defendants were receiving "financial kick backs" from J&M.  3d Am. Compl. ¶¶ 35, 49–50.  However, as discussed in further detail below, in response to the present motions for summary judgment, Raboczkay fails to produce any admissible evidence to substantiate his theories of retaliatory motivation.

In addition, as to Ramik, Raboczkay brings (i) a state-law defamation claim, id. ¶¶ 87–112, and (ii) a Fourteenth Amendment due process claim for the denial of Raboczkay's request for a "name-clearing" hearing, id. ¶¶ 56–71.

## II.  STANDARD OF DECISION

### A.  Motion for Summary Judgment

A motion for summary judgment under Federal Rule of Civil Procedure 56 shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists when there are "disputes over facts that might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "[F]acts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."  Scott v. Harris, 550 U.S. 372, 380 (2007).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  The moving party may discharge its burden by showing "that there is an absence of evidence to support the nonmoving party's case."  Horton v. Potter, 369 F.3d 906, 909 (6th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).

### B.  Motion to Dismiss

On a motion to dismiss pursuant to Rule 12(b)(6), "[t]he defendant has the burden of showing that the plaintiff has failed to state a claim for relief." Directv, Inc. v. Treesh, 487 F.3d 471, 476 (6th Cir. 2007).  To survive a Rule 12(b)(6) motion, the plaintiff must allege sufficient facts to state a claim to relief above the speculative level, such that it is "plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  The plausibility standard requires courts to accept the alleged facts as true, even when their truth is doubtful, and to make all reasonable inferences in favor of the plaintiff.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Twombly, 550 U.S. at 555–556.

Evaluating a complaint's plausibility is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679.  A complaint that offers no more than "labels and conclusions," a "formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement" will not suffice. Id. at 678.  However, a complaint need not contain "detailed factual allegations."  Twombly, 550 U.S. at 555.  Rather, a complaint needs only enough facts to suggest that discovery may reveal evidence of illegality, even if the likelihood of finding such evidence is remote.  Id. at 556. Accordingly, a motion to dismiss "should not be granted unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Directv, 487 F.3d at 476.

### III.  ANALYSIS

### A.  First Amendment Retaliation

To establish a First Amendment retaliation claim, the plaintiff must show "'(1) he was engaged in a constitutionally protected activity; (2) he was subjected to adverse action or deprived

of some benefit; and (3) the protected speech was a 'substantial' or 'motivating factor' in the adverse action.'" Haddad v. Gregg, 910 F.3d 237, 243 (6th Cir. 2018) (quoting Farhat v. Jopke, 370 F.3d 580, 588 (6th Cir. 2004)).  Defendants put forth multiple arguments to show why they are entitled to summary judgment on the retaliation claims.  However, the Court need only address one of these arguments to grant Defendants summary judgment on the retaliation claims: Raboczkay's failure to raise any triable issue regarding the third retaliation element, causation.

To satisfy the third element, Raboczkay "must demonstrate 'that the speech at issue represented a substantial or motivating factor in the adverse employment action.'" Vereecke v. Huron Valley Sch. Dist., 609 F.3d 392, 400 (6th Cir. 2010) (quoting Rodgers v. Banks, 344 F.3d 587, 602 (6th Cir. 2003)).  "A 'motivating factor' is essentially but-for cause . . . ." Leonard v. Robinson, 477 F.3d 347, 355 (6th Cir. 2007).  The Sixth Circuit utilizes a burden-shifting analysis for this part of a retaliation claim:

> "Once the plaintiff has met his burden of establishing that his protected conduct was a motivating factor behind any harm, the burden of production shifts to the defendant.  If the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on summary judgment."

Vereecke, 609 F.3d at 400 (quoting Leonard v. Robinson, 477 F.3d 347, 355 (6th Cir. 2007)).

While the role of the factfinder in retaliation cases is central "where both parties present some facts to support their motivation arguments," a court may grant summary judgment in a motivation inquiry if the plaintiff has failed to present any facts to support his theories of retaliatory motive. Aquilina v. Wriggelsworth, 759 F. App'x 340, 347 (6th Cir. 2018) (punctuation modified). This is because, at the summary judgment stage, it is the plaintiff's burden to come forward with evidence demonstrating that a jury could reasonably find in his favor. Cox v. Ky. Dep't of Transp., 53 F.3d 146, 150 (6th Cir. 1995).

Raboczkay plainly fails to carry this burden as to the causation element.  As to Ramik's argument that Raboczkay cannot show retaliatory motive, Raboczkay simply fails to respond.  Once Ramik pointed to the lack of evidence to support this element, see Ramik MTD/MSJ at 19–20, Raboczkay was obligated to come forward with evidence showing that there was a triable issue of fact on causation.  Horton, 369 F.3d at 909.  It is not the Court's responsibility to sua sponte search the record for genuine issues of material fact for him.  Betkerur v. Aultman Hosp. Ass'n., 78 F.3d 1079, 1087 (6th Cir. 1996).  Because Raboczkay failed to support an element necessary to his claim, summary judgment is warranted against him on his claim against Ramik.  Celotex, 477 U.S. at 323.

As to Sollars's motion on this point, Raboczkay does respond, but in a legally ineffectual way.  His flaw lies in pointing to evidence that is irrelevant or hearsay.  For example, Raboczkay purports to rebut causation by stating that Sollars "testified that he took the adverse action of suspending Plaintiff without pay" and "authorized the termination of Plaintiff."  See Resp. to Sollars MSJ at 30.  However, this only demonstrates that Sollars took adverse action—not that he was prompted by a retaliatory motive.  Further, Raboczkay's averment in his post-deposition affidavit that "city employees and officials told him that his suspension and subsequent termination were based upon Plaintiff's personal comments about J and M Towing that he shared with Chief Blair," id. at 30–31, does not constitute admissible proof of causation.  Such out-of-court statements submitted to prove the truth of the matter asserted therein are hearsay, Fed. R. Evid. 801, and hearsay cannot be considered on a motion for summary judgment.  Wiley v. United States, 20 F.3d 222, 225–226 (6th Cir. 1994).  Raboczkay points to no other evidence to support his theory that Defendants were motivated to retaliate against him due to his comments about J&M.

Although Raboczkay does not raise the issue of temporal proximity between his allegedly protected activity and the adverse action as evidencing retaliatory intent, Sollars does mention this issue solely to show that it has no application here.  See Sollars MSJ at 15.  He is correct.

Temporal proximity between protected activity and adverse action may be a relevant consideration in determining whether a defendant would not have taken an adverse action but for the plaintiff's protected speech.  However, the Sixth Circuit has cautioned that, "standing alone, temporal proximity generally is insufficient to establish causation." Lisan v. Wilkie, 835 F. App'x 831, 835 (6th Cir. 2020).  Only in rare circumstances—when protected activity and adverse action are "extremely close" in time—is an inference of retaliatory motive from temporal proximity alone justifiable.  See Vereecke, 609 F.3d at 401 ("[The Sixth Circuit's] case law can fairly be characterized as recognizing the possibility that, on a particular set of facts, extremely close temporal proximity could permit an inference of retaliatory motive, but also recognizing that often evidence in addition to temporal proximity is required to permit the inference."); Mickey v. Zeidler Tool & Die Co., 516 F.3d 516, 525 (6th Cir. 2008) (inferring causation where the defendant took the adverse action on the same day that he learned of the plaintiff's protected conduct).

Here, some nine months elapsed between the time Defendants became aware of Raboczkay's allegedly protected activity (at the March 2018 council meeting) and the only adverse action identified by Raboczkay in response to the summary judgment motions (the December 2018 termination of employment).  Such a gap simply provides no basis for supporting an inference of retaliatory intent without more.  See, e.g., Benison v. Ross, 765 F.3d 649, 661 (6th Cir. 2014) (finding seven-month gap insufficient); Vereecke, 609 F.3d at 401 (finding eight-month gap insufficient); Randolph v. Ohio Dep't of Youth Servs., 453 F.3d 724, 737 (6th Cir. 2006) (finding four-month gap insufficient); Hafford v. Seidner, 183 F.3d 506, 518 (6th Cir. 1999) (two- to five-

month gap insufficient); Cooper v. City of North Olmsted, 795 F.2d 1265, 1272 (6th Cir. 1986)
(finding four-month gap insufficient).

The conclusion of no triable issue on causation is further cemented by the evidence
showing that Defendants had a perfectly valid motive to terminate Raboczkay—evidence that he
had engaged in criminal activity. Ackerly, who oversaw the attorney general's investigation,
ultimately concluded that Raboczkay had violated Mich. Comp. Laws § 257.217c, by failing to
remit salvage inspection fees to the City.   Ackerly Dep. at 45–46. Ackerly's report confirmed
wrongdoing by Raboczkay, pointing to the fact that Raboczkay performed salvage vehicle
inspections at prohibited times (i.e., during times when Raboczkay was supposed to be exclusively
performing his duties as the motor carrier officer).   See Ackerly Report at PageID.1732. This
evidence of wrongdoing validated Ramik's decision, back in March or April of 2018, to contact
the Secretary of State for an investigation into the salvage vehicle inspection program after Ramik
had discovered the absence of any records showing that salvage vehicle inspection fees had been
turned over to the City.   Ramik Dep. at 7.   Although the attorney general, in her discretion,
ultimately declined to prosecute, this hardly shows that Raboczkay was "cleared of any
wrongdoing," as he now claims.   Raboczkay SAMF at ¶ 19.   Raboczkay supplies no evidence to
rebut the nonretaliatory motive that fully explains and justifies Defendants' action in terminating
him.[9]

Raboczkay has failed to submit any admissible evidence to substantiate his theory that
Defendants were motivated to retaliate against Raboczkay for his comments about J&M.
Consequently, a reasonable jury could not find that Raboczkay's comments were a motivating or

---

[9] Although his April 2018 suspension is not properly in the case, see footnote 8 above, the record
summarized above establishes a nonretaliatory motive for the suspension, as well as the later
termination in December 2018.

substantial factor in Defendants' decisions to take the alleged adverse actions.  Defendants, therefore, are entitled to summary judgment on the First Amendment retaliation claims against them.

### B. Defamation

Raboczkay brings his defamation claim against Ramik based on Ramik's alleged defamatory statements made to the press and state officials involved in the criminal investigation. 3d Am. Compl. ¶¶ 87–112.  To succeed on a defamation claim under Michigan law, a plaintiff must show (i) a false and defamatory statement about the plaintiff; (ii) an unprivileged communication to a third party; (iii) fault amounting at least to negligence on the part of the publisher; and (iv) actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication.  Mitan v. Campbell, 706 N.W.2d 420, 421 (Mich. 2005).  Ramik argues that Raboczkay cannot prove any of these elements.  Notably, with respect to the third element, Ramik argues that Raboczkay is a public official and, therefore, he must demonstrate that Ramik's statements were made with actual malice yet fails to do so.  Ramik MTD/MSJ at 8–10.  Raboczkay disagrees.  See Resp. to Ramik MTD/MSJ at 18–21 (Dkt. 107).[10]

---

[10] At times, Ramik refers to Raboczkay's status as a "limited" public official.  Ramik's use of the term "limited" is likely an oversight, given that the "limited" qualifier is used to categorize certain public figures, not public officials.  Relatedly, Ramik appears to conflate the "public official" and "public figure" terms; in response to Ramik's assertion that Raboczkay is a public official, Raboczkay argues that he is not a "public figure," limited or otherwise.  See Resp. to Ramik MTD/MSJ at 18–20.  "Public figures" and "public officials" are not coterminous, though an individual may satisfy the definition of both terms.  See Curtis Pub. Co. v. Butts, 388 U.S. 130, 155 (1967).  A public official is a person who has or appears to the public to have substantial responsibility for the control of government affairs.  Rosenblatt v. Baer, 383 U.S. 75, 85 (1966). There are two types of public figures: general purpose and limited purpose.  Gertz v. Robert Welch, Inc., 418 U.S. 323, 342, 351 (1974).  A general purpose public figure is an individual who achieves pervasive fame or notoriety, and a limited purpose public figure is someone who voluntarily injects himself or is drawn into a particular controversy.  See id.; Wolston v. Reader's Digest Ass'n, Inc., 443 U.S. 157, 164 (1979).  Although not all public figures are public officials (and vice versa), the

Ramik is correct that Raboczkay is a public official and has failed to submit any evidence demonstrating that Ramik made his statements with actual malice. Ramik is, therefore, entitled to summary judgment on the defamation claim. Accordingly, the Court will not address Ramik's other challenges to the defamation claim.

### i. Public Official

If a plaintiff bringing a defamation claim is a "public official," the plaintiff must also establish that the defendant published the defamatory statement with "actual malice." New York Times Co. v. Sullivan, 376 U.S. 254, 280 (1964). The characterization of the party claiming defamation is a question for the Court. See Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485, 510 (1984).

"[T]he 'public official' designation applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs." Rosenblatt, 383 U.S. at 85. This is because "[c]riticism of government is at the very center of the constitutionally protected area of free discussion" and, therefore, there is "a strong interest in debate about those persons who are in a position significantly to influence the resolution of those issues." Id. Accordingly, courts have held that the public official designation applies to both higher and lower ranking law enforcement officers. See Young v. Gannett Satellite Network, Inc., 734 F.3d 544, 554 (6th Cir. 2013); Tomkiewicz v. Detroit News, Inc., 635 N.W.2d 36, 42–43 (Mich. Ct. App. 2001).[11]

---

actual malice requirement applies to statements about both public officials and public figures. Greenbelt Co-op. Pub. Ass'n v. Bresler, 398 U.S. 6, 11 (1970).

[11] Raboczkay argues that Tomkiewicz is "easily distinguishable" because the Tomkiewicz plaintiff was a current police lieutenant whereas Raboczkay had retired from his position as a police officer at the time that Ramik made his statements about Raboczkay. Resp. to Ramik MTD/MSJ at 20. This argument is unpersuasive. As discussed below, even though Raboczkay was not a police

The justification for applying the designation to lower ranking law enforcement officers is that, even though such officials "have slight voice in setting departmental policies," their "duties are peculiarly 'governmental' in character and highly charged with the public interest." Tomkiewicz, 635 N.W.2d at 43 (citation omitted). Put differently, "law enforcement is a primary function of local government" and "the public has a far greater interest in the qualifications and conduct of law enforcement officers, even at, and perhaps especially at, an 'on the street' level than in the qualifications and conduct of other comparably low-ranking government employees performing more proprietary functions." Id. (citation omitted). Even the abuse of a low-ranking law enforcement official's office can "have great potentiality for social harm" and, therefore, "public discussion and criticism directed towards the performance of that office cannot constitutionally be inhibited by threat of prosecution under State libel laws." Id. (citation omitted).

Raboczkay was a member of law enforcement by virtue of his position a salvage vehicle inspector and his position as a motor carrier officer. Under Mich. Comp. Laws § 257.217c, authorized salvage inspectors are defined as including, as relevant here, "[a] previously certified police officer who is appointed by the local police agency as a limited enforcement officer to conduct salvage vehicle inspections." Id. § 257.217c(15)(c) (emphasis added). The statute states that "[t]he local police agency shall give this officer access to the agency's law enforcement information network system and the authority to confiscate any stolen vehicle or vehicle parts discovered during an inspection." Id. The local police agency may even "give the officer the authority to arrest a person suspected of having unlawful possession of a stolen vehicle or vehicle parts." Id. Here, Raboczkay became certified as a salvage inspector while he was a police officer

---

officer when Ramik made his statements, Raboczkay was the motor carrier officer and a salvage vehicle inspector; as such, he was a member of law enforcement. Tomkiewicz clearly supports the proposition that law enforcement officers are public officials.

and, after he retired from his position as a police officer, the City's police department sponsored Raboczkay as a salvage vehicle inspector. Sponsor Letter. Raboczkay's sponsor letter expressly authorizes Raboczkay to use the police department's law enforcement information network to check VIN numbers from inspected vehicles. Id.

Further, as Ramik points out, Raboczkay testified in his deposition that, as a motor carrier officer, he had authority to issue citations to commercial vehicles. Raboczkay Dep. at 28. Raboczkay also testified that his general duties as the City's motor carrier officer included "truck enforcement," such as "issu[ing] citations for any kind of truck-related violations," including "[e]verything from speeding to . . . commercial violations"; as well as providing "backup [to] other law enforcement officers" and serving "as a resource for other law enforcement personnel in criminal investigations involving commercial vehicles." Raboczkay Dep. at 9, 16–17. The job description of a motor carrier officer corroborates Raboczkay's testimony:

> Motor carrier officers are armed uniformed members of the Michigan State Police Commercial Vehicle Enforcement Division, specializing in commercial vehicle enforcement.
>
> Motor carrier officers enforce traffic safety laws on commercial vehicles, protect the infrastructure through aggressive size and weight enforcement, conduct commercial vehicle and driver inspections, and contribute to homeland security efforts by enforcing hazardous material regulations.
>
> Motor carrier officers also respond to emergency situations, e.g., assist distressed motorists, backup other law enforcement officers, and are a resource for other law enforcement personnel in criminal investigations involving commercial vehicles.

Job Description (Dkt. 98-4). Raboczkay's letter of employment, which sets forth the duties of employment for the City's motor carrier officer, likewise corroborates Raboczkay's testimony:

> The Motor Carrier Officer will report directly to the Chief of Police and the Motor Carrier Officer shall perform Commercial Vehicle Enforcement and other functions and duties as assigned by the Chief of Police.

Letter of Employment at ¶ 2.

Thus, the uncontradicted evidence establishes that, as a salvage vehicle inspector and motor carrier officer, Raboczkay was a member of law enforcement.  His duties as a salvage vehicle inspector involved using the police department's law enforcement information network to conduct investigations and he had the authority to confiscate stolen vehicles and vehicle parts.  His duties as a motor carrier officer involved commercial vehicle enforcement.  Because he was a law enforcement official, Raboczkay was a public official.  See Tomkiewicz, 635 N.W.2d at 43.

Having determined that Raboczkay was a public official, the next step in the analysis is to determine whether Ramik's comments about Raboczkay related to Raboczkay's official conduct. See Sullivan, 376 U.S. at 279–283.  This inquiry is easily answered in the affirmative.  As early as his complaint, Raboczkay has acknowledged that Ramik commented to the press and investigators that (i) two City "cops" were not turning in fees paid to inspect vehicles, (ii) the money collected from these inspections could not be located, and (iii) thousands of dollars in fees were missing. See 3d Am. Compl. ¶¶ 94–104.  Such remarks are clearly related to a public official's conduct; "anything which might touch on an official's fitness for office is relevant" and "[f]ew personal characteristics are more germane to fitness for office than dishonesty, malfeasance, or improper motivation . . . ."  Garrison v. State of Louisiana, 379 U.S. 64, 76 (1964).

Because Raboczkay was a public official and Ramik's statements related to Raboczkay's official conduct, Raboczkay can only succeed on his defamation claim if he can show that Ramik made his statements with actual malice.  For the reasons that follow, Raboczkay fails to do so.

### ii.  Actual Malice

A plaintiff must show actual malice by clear and convincing evidence—the most demanding standard applied in civil cases.  Thomas M. Cooley Law Sch. v. Kurzon Strauss, LLP, 759 F.3d 522, 527, 531 (6th Cir. 2014).  The applicable standard of clear and convincing evidence

is premised on the "unique character of the interest protected by the actual malice standard[:] our profound national commitment to the free exchange of ideas." Id. at 532 (citation omitted). Whether a record may support a finding of actual malice is a question of law. Id. at 527. This issue is characterized as a legal one in order to recognize "that judges, as expositors of the Constitution, have a duty to independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of actual malice." Id. at 532 (citation omitted).

The actual malice standard is not satisfied merely through a showing of ill will or "malice" in the ordinary sense of the term. Harte-Hanks Communications, Inc. v. Connaughton, 491 U.S. 657, 666 (1989). Rather, a defendant acts with "actual malice" when he acts "with knowledge that [the statement] was false or with reckless disregard of whether it was false . . . ." Sullivan, 376 U.S. at 280. This standard is a subjective one. Thomas M. Cooley Law Sch., 759 F.3d at 531. A defendant makes a statement with reckless disregard for the truth if he makes the statement "with a high degree of awareness of probable falsity," or after he "entertained serious doubts as to the truth of his publication." Harte-Hanks, 491 U.S. at 667.

Raboczkay argues that the actual malice standard is satisfied in this case because, at the time that Ramik contacted state officials and the press, Raboczkay had not been charged with a crime and "more importantly, no independent criminal investigation had even taken place whereby Defendant Ramik could make the defamatory remarks that Plaintiff had committed a crime of embezzlement." Resp. to Ramik MTD/MSJ at 21. But there is no authority holding that malice can be established where a defendant speaks before an independent criminal investigation has taken place. To require speakers to hold their tongues until a governmental authority had

18

investigated a matter would silence the free exchange of ideas that the First Amendment was designed to protect.

Raboczkay's argument also ignores the principle that "reckless disregard for the truth" is measured by whether a defendant in fact entertained serious doubts concerning the truth of his statements.  E.g., Thomas M. Cooley Law Sch., 759 F.3d at 534 ("[W]hether a statement was made with reckless disregard for the truth is not measured by whether a reasonably prudent man would have published or would have investigated before publishing, but by whether the defendant in fact entertained serious doubts as to the truth of its publication.") (punctuation modified).  Raboczkay comes forward with no evidence that Ramik harbored any doubts, much less serious ones.  In fact, the record shows that Ramik had good reason to believe that Raboczkay had engaged in criminal acts, given that Ramik had attempted to locate records of money being turned into the City from the salvage vehicle inspection program but was unable to find any such records.  Ramik Dep. at 9.

Raboczkay fails to point to any evidence showing that Ramik subjectively believed his statements to be false or that he made them with reckless disregard for the truth.  Nor is there anything in the record to suggest that Ramik made his statements with actual malice.  To the contrary, the evidence suggests that Ramik subjectively believed his statements to be true based on his unsuccessful attempt to locate records of salvage vehicle inspection fees being turned into the City.  As a result, the record does not permit a jury to find by clear and convincing evidence that Ramik made his statements about Raboczkay with actual malice.  Ramik is, therefore, entitled to summary judgment on the defamation claim against him.

### C.  Due Process

Raboczkay brings a Fourteenth Amendment claim against Ramik, alleging that Ramik violated Raboczkay's due process rights by denying him a name-clearing hearing to refute Ramik's

false and defamatory statements.  3d Am. Compl. ¶¶ 56–71.  A plaintiff must allege five factors to establish that he was deprived of a liberty interest and entitled to a name-clearing hearing:

> First, the stigmatizing statements must be made in conjunction with the plaintiff's termination from employment . . . .  Second, a plaintiff is not deprived of his liberty interest when the employer has alleged merely improper or inadequate performance, incompetence, neglect of duty or malfeasance . . . .  Third, the stigmatizing statements or charges must be made public.  Fourth, the plaintiff must claim that the charges made against him were false.  Lastly, the public dissemination must have been voluntary.

Crosby v. Univ. of Ky., 863 F.3d 545, 555 (6th Cir. 2017).

Ramik moves to dismiss the due process claim against him, arguing that (i) Raboczkay lacks a property interest in his at-will employment and (ii) Raboczkay failed to request a name-clearing hearing directed at Ramik or his counsel.  Ramik MTD/MSJ at 22.[12]  Each challenge is addressed in turn.

### i. Property or Liberty Interest

Due process claims require the deprivation of a liberty or property interest.  See EJS Props., LLC v. City of Toledo, 698 F.3d 845, 855 (6th Cir. 2012).  Ramik argues that Raboczkay's letter of employment establishes that his employment was at-will and, therefore, that Raboczkay lacked a property interest in continued employment with the City.  Ramik MTD/MSJ at 23 (citing Letter of Employment).  Raboczkay does not dispute that he lacked a property interest in his continued employment.  However, he argues that he has a protected liberty interest in his "reputation, good

---

[12] Although the introduction of Ramik's motion provides in a blanket manner that he moves for summary judgment "on all four claims plead against him," Ramik MTD/MSJ at PageID.1369, his arguments regarding Raboczkay's due process claim are limited to Raboczkay's failure to state a valid cause of action, see id. at 22–24; Raboczkay's arguments focus only on the allegations made in Raboczkay's third amended complaint and the documents attached thereto or referenced therein, see id.  Consequently, the Court considers only whether Ramik is entitled to dismissal of Raboczkay's due process claim under Rule 12(b), not whether Ramik is entitled to summary judgment on this claim under Rule 56.

name, honor, and integrity," which includes "being free to move about, live, and practice his profession without the burden of an unjustified label of infamy." Resp. to Ramik MTD/MSJ at 25. Indeed, Raboczkay alleged that he suffered harm to his reputation as a result of Ramik's statements. 3d Am. Compl. ¶¶ 58–61.

Raboczkay is correct that the Due Process Clause of the Fourteenth Amendment protects an individual's liberty interest in their "reputation, good name, honor, and integrity." Quinn v. Shirey, 293 F.3d 315, 319 (6th Cir. 2002). That liberty interest is impugned when a state actor "stigmatizes" an individual by means of "voluntary, public dissemination of false information" about the individual. Id. at 320 (punctuation modified). "[W]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." Bd. of Regents v. Roth, 408 U.S. 564, 573 (1972). But defamation alone is not enough to trigger this constitutional protection; rather, the alleged damage must be tied to "[s]ome alteration of a right or status 'previously recognized by state law.'" Quinn, 293 F.3d at 319 (quoting Paul v. Davis, 424 U.S. 693, 711–712 (1976)). Typically, this means that defamation of an individual must be tied to the termination of that individual's employment. See Paul, 424 U.S. at 710.

Here, Raboczkay has alleged that Ramik's defamatory statements were tied to the termination of Raboczkay's employment, which is all that is required to overcome a Rule 12(b) motion. Accordingly, Raboczkay's due process claim will not be dismissed for failure to allege a property interest, as Raboczkay has sufficiently alleged a liberty interest.

### ii. Request and Denial of Name-Clearing Hearing

Ramik argues that because Raboczkay's attorney sent the demand for a name-clearing hearing to Gorski—not Ramik or his counsel—and, further, the attorney who denied the request

was the City's attorney—not Ramik's attorney—Raboczkay's due process claim against Ramik must be dismissed.  See Ramik MTD/MSJ at 24 (citing 6/16/19 Request; 6/18/19 Denial).

A plaintiff must first request a name-clearing hearing before he can show that he was deprived of a liberty or property interest in his reputation without due process.  Quinn, 293 F.3d at 322.  Further, a plaintiff's request must be denied.  Id. at 320 ("It is the denial of the name-clearing hearing that causes the deprivation of the liberty interest without due process.").  A defendant can only deny a request if he has the ability, authority, or influence to do so.  See Caleb v. Grier, 598 F. App'x 227, 239 (5th Cir. 2015); Kelly v. Burkes, 414 F. Supp. 2d 681, 684 (E.D. Ky. 2006).  Thus, to survive a motion to dismiss, a plaintiff must allege facts indicating that the defendant had the ability, authority, or influence to deny the plaintiff's request for a name-clearing hearing.  See Caleb, 598 F. App'x at 239.

Here, Raboczkay alleges that he requested a name-clearing hearing and that this request was denied.  3d Am. Compl. ¶¶ 64, 66.  Although the City's attorney—not Ramik's attorney— denied the request, Raboczkay alleges that Ramik "directed and authorized" this attorney to deny the request.  Id. ¶ 66.  Thus, Raboczkay alleges—albeit in a borderline conclusory manner—that Ramik had the authority or ability to deny the request.  Raboczkay's due process claim is, therefore, just barely able to survive Ramik's Rule 12(b) motion.

It is unclear that Raboczkay will ultimately be able to prove that Ramik—a mere councilman—actually had the ability, authority, or influence to deny Raboczkay's request for a name-clearing hearing; the parties' deposition testimonies do not appear to provide support for such.  However, because Ramik only moved for dismissal of the due process claim—not for summary judgment on the claim—the Court will not concern itself with matters of proof at this time.  Nonetheless, with discovery completed, it would be prudent to determine whether a trial is

22

necessary regarding this last remaining issue in the case.  Therefore, the Court will provide Ramik with an opportunity to file a motion for summary judgment on the due process claim.

## IV.  CONCLUSION

For the foregoing reasons, the Court grants Sollars's motion for summary judgment (Dkt. 98).  Further, the Court grants in part and denies in part Ramik's motion to dismiss and for summary judgment (Dkt. 99).  Specifically, the Court grants the motion as to Ramik's request for summary judgment on the defamation and First Amendment retaliation claims against him, but denies Ramik's motion insofar as it seeks dismissal of the due process claim.  However, the Court grants Ramik leave to file a motion for summary judgment on Raboczkay's due process claim.  If Ramik wishes to file such a motion, he must do so within 14 days of the date of this opinion.  A response is due 21 days after service of the motion, and a reply is due seven days after service of any response.

SO ORDERED.

Dated: June 17, 2021                              s/Mark A. Goldsmith
       Detroit, Michigan                          MARK A. GOLDSMITH
                                           United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on June 17, 2021.

                                        s/A. Chubb for Karri Sandusky
                                        KARRI SANDUSKY
                                        Case Manager